CHEHARDY, Judge.
Frank J. Ricaud appeals his conviction of simple battery, a violation of LSA-R.S. 14:35. He was sentenced to six months in the parish prison, suspended, and placed on active probation for one year, with certain conditions. He raises no specific assignments of error but urges this Court to review the record for sufficiency of evidence and for patent errors.
FACTS
The incident occurred on February 26, 1984 at approximately 8:30 p.m. in front of an Eeol service station and convenience store on Metairie Road in Metairie, Louisiana. The victim, James T. “Terry” Bottom, was engaged in a fistfight with several young men in which he sustained lacerations and bruises to his face and damage to several teeth.
Bottom testified he had gone into the convenience store to purchase soft drinks and a magazine. While he was standing in the checkout line, a car occupied by several people pulled up in front of the store with its radio blaring. One of the passengers came into the store and the cashier greeted him by name. As Bottom walked out of the store, he said, he shook his head and emitted an exasperated “shu” to express his annoyance' at the loudness of the music. He said the music immediately stopped and someone yelled an obscenity.
According to Bottom, he turned and discovered the driver of the car advancing toward him, threatening to “beat my tail.” The passengers in the vehicle quickly surrounded Bottom and as Bottom tried to defuse the situation, a white car driven by a man with curly black hair pulled into the parking lot. Bottom stated that the driver of the first vehicle and the new arrival simultaneously “coldcocked” him.
He testified that in the ensuing struggle he was struck by several persons, thrown on the ground, and kicked in the face by the driver of the first vehicle and others. He regained his feet and demanded that the store’s cashier, who had come out into the lot, call the police. Bottom said his attackers then scurried back into their cars and fled. Bottom re-entered the store and was assisted by the cashier in cleaning the blood off his face. The police arrived and were given a description of the perpetrators and their vehicles. The cashier denied knowing the identity of any of the attackers.
Afterward Bottom was treated at a nearby hospital for bruises and lacerations, including a cut on his chin that required five stitches. Several of his teeth were chipped and cracked, ultimately requiring over $1,200 in dental repairs. He also suffered a mild concussion and extensive swelling around his right eye.
Bottom stated he returned to the Ecol store a few days later, accompanied by his wife, and questioned the cashier who had been on duty that night. Bottom was certain the cashier knew who the attackers were because he had greeted one of them by name before the fight started. Bottom persisted through several minutes of evasive answers; finally, he said, the cashier told him “it was the Bucktown gang that did it” and that “the primary fellow that was kicking me in the face, his name was Frank Ricaud.”
Bottom began an independent investigation, driving around the Bucktown area of Metairie for an hour or two each day. On the fourth day he noticed Frank Ricaud driving the vehicle used on the night of the incident. Bottom jotted down the license number and passed the information on to the police. A computer check revealed the car was registered to one Keith Arnold. Bottom spoke to Arnold’s wife and learned *1021 that the vehicle had been sold to Frank Ricaud several months earlier.
Through continuing investigation Bottom learned Ricaud’s address. With the help of a friend, Bottom photographed Ricaud sitting on the steps of his home. Based on the photographs and other information, a warrant was eventually issued for Ricaud’s arrest on the charge of second degree battery. Ricaud learned of it and turned himself in.
Ricaud testified on his own behalf, as did Vincent Lamantia and Robert Arms, two of his friends who had been in his car that night. Bottom had testified that there were five persons in the defendant’s car; Ricaud and other defense witnesses testified there were only three. They also testified that Bottom was drunk and staggered out of the store shouting obscenities at them. They said at that point two unnamed men whom Ricaud knew by sight arrived and began wrestling with Bottom.
According to Ricaud, he and the cashier attempted to break up the fight. Bottom struck Ricaud a glancing blow, whereupon Ricaud struck Bottom on the side of the head, knocking him down, and broke off the engagement. Ricaud stated he then entered the store with the cashier to use the restroom. When he came out of the restroom, Bottom was standing by the cash register, bleeding profusely about the face. Ricaud said one of his friends told him Bottom had been hit several times by the late arrivals.
Ricaud testified he was not looking for a fight because he was “getting ready” for hernia surgery and that as a result of the fight his surgery had to be expedited. (We note, however, that there was an 8V2-month delay between the fight and his surgery.)
Lamantia corroborated Ricaud’s testimony concerning Bottom’s apparent drunken condition and obscene threats. However, Lamantia testified that Bottom swung at Ricaud and Ricaud knocked him down; thereafter the unnamed attackers intervened, knocked Bottom- down and kicked him. Lamantia did not mention any intervention by the store cashier.
Arms testified that Bottom confronted Ricaud as they entered the store, that Bottom and the man with curly black hair began fighting and that Ricaud tried to break up the fight.
The store cashier, Thomas Trahan, was also called by the defense. He did not see the fight start, but went into the parking lot to break up the fight between Bottom and Ricaud. He said Ricaud went back into the store with him to use the restroom while Trahan called the police. He said Bottom appeared uninjured and remained outside, but came in a few minutes later bleeding profusely, having fought with the two unknown arrivals.
Trahan admitted he was acquainted with Ricaud, Lamantia and Arms, but denied either speaking to Bottom after the incident or telling him he knew who the attackers were. Although Ricaud and Lamantia had testified Bottom was “dead drunk” and staggering, Trahan said he did not notice any obvious signs of intoxication.
Bottom’s wife testified she accompanied him to the store when he questioned Tra-han and heard the entire conversation between her husband and Trahan.
SUFFICIENCY OF EVIDENCE
In reviewing the sufficiency of evidence, the reviewing court must determine that the record evidence, viewed in the light most favorable to the prosecution, is sufficient to convince a rational juror that the defendant is guilty beyond a reasonable doubt of the crime of which he has been convicted. State v. Camp, 446 So.2d 1207 (La.1984).
Battery is the intentional use of force or violence upon the person of another. LSA-R.S. 14:33. Ricaud was convicted of simple battery, which is defined as a battery committed without the consent of the victim. R.S. 14:35. (It is a lesser-included offense of the offense with which Ricaud was charged, second degree battery.)
Because the simple battery statute contains no qualifying provisions, “intention *1022 al” as used in the statute defining battery means general criminal intent. LSA-R.S. 14:11. “General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.” LSA-R.S. 14:10(2).
Thus, the State had to prove beyond a reasonable doubt that Ricaud used force or violence against Bottom without his consent and that the force or violence to Bottom’s person either was actively desired by Ricaud or was reasonably certain to result from his actions, thereby indicating that Ricaud adverted to the prescribed criminal consequences.
The trial judge’s decision in this case turned on a credibility ruling. In finding Ricaud guilty of simple battery, the judge indicated he found Bottom’s version of the events more credible. Although Ricaud admitted he struck Bottom, he tried to establish a justification defense (LSA-R.S. 14:19).
It is not the function of a reviewing court to evaluate the credibility of the witnesses. It is the role of the fact-finder to weigh the respective credibility of the witnesses and an appellate court should not second-guess the trier of fact’s credibility determinations. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983).
Considering the contradictions in the defense witnesses’ individual versions of the events, we find no error in the trial court’s credibility determination. Viewing the evidence in the light most favorable to the prosecution, we conclude the State proved beyond a reasonable doubt that Ri-caud intentionally used force or violence against the person of Bottom, without his consent and without justification. All the elements of simple battery were present.
PATENT ERROR
Patent error is an error discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence. LSA-C.Cr.P. art. 920. For the purpose of a patent error review, the “record” in a criminal case includes the caption, the time and place of holding court, the indictment or information and the endorsement thereon, the arraignment, the plea of the accused, the bill of particulars filed in connection with a short-form indictment or information, the mentioning of the impaneling of the jury if applicable, the minute entry reflecting sequestration in a capital case, the verdict, and the judgment or sentence. See State v. Oliveaux, 312 So.2d 337 (La.1975).
We have examined the record closely in light of these directives and find no errors patent on its face.
For the foregoing reasons, the defendant’s conviction and sentence herein are affirmed.
AFFIRMED.